UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                              :
                                              :
ONEIL ST. ELMO BURNS,                         :
                     Petitioner,              :        Civil Action No.: 09-CV-2609-FLW
                                              :
v.                                            :                OPINION
                                              :
EDWARD CICCHI, Warden, Middlesex              :
County Board of Corrections, and JOHN E.      :
THOMPSON, District Director, U.S. Dept.       :
of Homeland Security, et al.,                 :
                                              :
                     Respondents.             :
_____              :

WOLFSON, United States District Judge:

        Presently before the Court is a Petition by Mr. Oneal St. Elmo Burns for a Writ of Habeas

Corpus.  Mr. Burns' Petition arises from his detention in the Hudson County Correctional Center,

pending a hearing to address his potential removal from the United States pursuant to 8 U.S.C.

§§1227(a)(2)(C), and (a)(2)(B)(i).  Mr. Burns alleges that he was wrongfully denied bond because

he is not subject to mandatory detention under 8 U.S.C. §1226(c).  Respondents John E. Thompson

and the United States Department of Homeland Security (collectively, "the Government") have

filed a motion to dismiss the Petition, arguing that Mr. Burns is in fact subject to mandatory

detention without bond under the statute.  For the following reasons, Mr. Burns' Petition is

granted.

I.        BACKGROUND

        A.        Facts

        Mr. Burns is a native and citizen of Jamaica who acquired status as a lawful permanent

resident of the United States on or about December 9, 1983, when he entered the United States.  See

1

Petition at 2.  Mr. Burns is the father of a U.S. citizen child, and has other ties to the community, including the U.S. citizen mother of his child and two lawful permanent resident brothers.  Id. at 7.  He was disabled in 1986 as a consequence of a brain injury sustained in an automobile accident, but was able to work part-time as a welder.  Id.

On or about August 1, 1990, Mr. Burns was convicted of Unlawful Possession of a Weapon and Possession of a Controlled Dangerous Substance, in violation of New Jersey law.  See Order for Commitment dated 8/1/90, State of New Jersey v. O'Neil S. Burns, Govt. Resp., Decl. of Alan Wolf, Exh. A at 8.  He was sentenced to a five-year period of incarceration.  Id.; see In the Matter of St. Elmo Burns, Decision and Order of the Immigration Judge, A 038-570-382 (June 5, 2009) ("Immigr. Order") at 1.  It is this conviction that the Government alleges renders Mr. Burns removable.

Since 1990, Mr. Burns was thrice convicted of additional offenses in New Jersey.  In 1996, he was convicted of an Attempt to Elude Police charge.  Petition at 4.  In 1998, he plead guilty to both Unsworn Falsification to Authorities and Driving under the Influence of Alcohol or Controlled Substance.  Lastly, in 2002, Mr. Burns was again convicted of Attempt to Elude Police. Id.  The record does not reveal whether Petitioner was incarcerated, and/or released on parole, supervised release, or probation in connection with the 1996, 1998, and 2002 offenses.[1]

On March 18, 2009, Mr. Burns was personally served with a Notice to Appear ("NTA") charging him removable from this country pursuant to the Immigration and Nationality Act ("INA") § 237(a)(2)(C) and 237(a)(2)(B)(i).  Id.  at 8.  The NTA charged him as removable based on his 1990 conviction.  Id. at 9.  Mr. Burns complied with the NTA and appeared.  Since his

---

[1]   The Government has not provided this Court with any documentation relating to Mr. Burns' 1996, 1998, and 2002 offenses.

appearance, he has been detained without bond pending his removal hearing.  Id. at 10.

While detained, Petitioner requested that he be released on bond because he was not, in his view, subject to mandatory detention under the INA.  He argued before the Immigration Judge ("IJ") that section 1226(c)'s mandatory detention requirement  is inapplicable to him because he was not released from criminal custody in connection with a removable offense after the statute's 1998 effective date.  Id. at 9.  On June 5, 2009, the IJ rejected his request, ruling instead that Mr. Burns was subject to mandatory detention under the statute.  See Immigr. Order at 3.  The IJ based his decision on a series of opinions issued by the Board of Immigration Appeals ("BIA"), each interpreting section 1226(c).  The central opinion he relied upon is Matter of Saysana, 24 I. & N. Dec. 602 (BIA 2008) ("Saysana").

Mr. Burns filed a  Petition for a Writ of Habeas Corpus with this Court in May of 2009.  He then filed a Notice of Appeal with the BIA on July 1, 2009.  Because the June Order was interlocutory in nature, the IJ issued a final bond decision to facilitate Mr. Burns' appeal.  See In the Matter of Oneil St. Elmo Burns, File No. A 038-570-382, Bond Memorandum at 2 (July 8, 2009).  This second ruling again held that Petitioner was ineligible for bond.

Mr. Burns' petition asks this Court to: (1) assume jurisdiction over this matter; (2) issue a Writ of Habeas Corpus, directed to Respondents, ordering them to release Mr. Burns immediately on his own recognizance or upon the setting of a reasonable bond; (3) award Petitioner costs and reasonable attorney's fees and; (4) award any other relief that the Court deems just and appropriate.  See Petition at 17-18.  After he filed this petition, and while in detention, Mr. Burns married his U.S. citizen fiancée on August 28, 2009.  See Pet. Reply, Exh. 1.

B.       Statutory History

As enacted in 1952, the Immigration and Nationality Act gave the Attorney General

discretion to detain or release an alien prior to a final determination of deportability.  See 8 U.S.C. §1252(a) (1970 ed.); Velasquez v. Reno, 37 F.Supp.2d 663, 666 (D.N.J. 1999).  The INA was amended in 1988 by the Anti-Drug Abuse Act, which added a mandatory detention provision for aliens that had committed aggravated felonies.  See Velasquez, 37 F. Supp. at 666; INA § 242(a)(2), codified at 8 U.S.C. §1252(a)(2)(1990)[2].  That Act provided that the alien felon was to be taken into custody by the Attorney General "upon completion of the alien's sentence for such conviction."  Probert v. I.N.S., 954 F.2d 1253, 1255 (6th Cir. 1992) (quoting statutory language).  In response to rulings declaring the 1988 amendments unconstitutional, Congress again amended the INA in 1990, this time allowing for bond (and subsequent release pending deportation hearings) for certain lawfully admitted aliens.  See Velasquez, 37 F. Supp. at 666; 8 U.S.C. §1252(a)(2)(B)[3].

The 1990 amendment, further, provided for the mechanism by which aliens convicted of aggravated felonies would come into the Attorney General's custody:

_____

[2]      Former section 1252(a)(2) provided for the mandatory detention of those convicted of aggravated felonies:

> The Attorney General shall take into custody any alien convicted of an aggravated felony *upon completion of the alien's sentence for such conviction*. Notwithstanding subsection (a) of this section, the Attorney General shall not release such felon from custody.

Probert v. I.N.S., 954 F.2d 1253, 1255 (6th Cir. 1992) (emphasis added).

[3]      The 1990 amendment read:

> The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony either before or after a determination of deportability *unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings*.

Probert, 954 F.2d at 1255 (6th Cir. 1992) (emphasis added).

4

> The Attorney General shall take into custody any alien convicted of
> an aggravated felony *upon release of the alien (regardless of whether or*
> *not such release is on parole, supervised release, or probation, and*
> *regardless of the possibility of rearrest or further confinement in respect of*
> *the same offense)* ....

Cuomo v. Barr, 812 F.Supp. 324, 326 n.3 (N.D.N.Y. 1993) (quoting 8 U.S.C. § 1252(a)(2)(A))
(emphasis added).

The Sixth Circuit interpreted this amendment "to permit the mandatory detention of an
alien convicted of an 'aggravated felony' only when that aggravated felony conviction serves as
the basis for deportation." Probert v. I.N.S., 954 F.2d 1253, 1255 (6th Cir. 1992).  Like the 1988
amendment, this amendment was ultimately held unconstitutional by several district courts.  See
Velasquez, 37 F. Supp. at 666 (citing Caballero v. Caplinger, 914 F.Supp. 1374, 1379-80 (E.D.La.
1996)); see e.g., Paxton v. United States INS, 745 F.Supp. 1261, 1265-66 (E.D. Mich. 1990); Kellman
v. INS, 750 F.Supp. 625, 628 (S.D.N.Y. 1990).  But see e.g., Davis v. Weiss, 749 F.Supp. 47, 50, 52
(D.Conn. 1990).

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA")
and the Illegal Immigration and Immigrant Responsibility Act ("IIRIRA").  The AEDPA deleted
the provision providing for bond for legal aliens and reenacted provisions providing for
mandatory detention of aliens who had committed certain enumerated crimes.  See Velasquez, 37
F. Supp. at 666.  The enumerated crimes included not only aggravated felonies, but also possession
of controlled substances, certain firearm offenses, crimes involving moral turpitude, and other
miscellaneous crimes.  Id. at 666-67.  This section of the AEDPA was soon thereafter replaced by
section 236(c) of the INA, enacted as part of the IIRIRA.  The IIRIRA's mandatory detention
provision is codified at 8 U.S.C. §1226(c).  Id.

Implementation of the IIRIRA was deferred from 1996-1998, during which time the

Transition Period Custody Rules ("TPCR") were in effect. Id. at 667. The TPCR provided for bond hearings for aliens that were removable for having committed certain crimes, and provided for bond to be set in particular instances. Velazquez, 37 F.Supp. at 666. The TPCR expired on October 9, 1998, at which point 8 U.S.C. §1226(c) became effective. Id.

Section 1226, like some of its statutory predecessors, grants the Attorney General discretion to release alien detainees on bond:

> **(a) Arrest, detention, and release**
>
> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. *Except as provided in subsection (c) of this section* and pending such decision, the Attorney General--
>
> **(2)** may release the alien on--
>
> **(A)** bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; ....

8 U.S.C. §1226(a) (emphasis added).

That discretion is limited, however, by the mandatory detention provision found in subsection (c)(1) of the statute:

> **(1)   Custody**
>
> The Attorney General *shall take into custody any alien who*—
>
> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year,

> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> *when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

Id. (emphasis added). In short, any alien that falls within categories (A)-(D) may not be released on bond.

II.      DISCUSSION

    A.      Jurisdiction

This Court derives subject matter jurisdiction over Mr. Burns' Petition for a Writ of Habeas Corpus from 28 U.S.C. § 2241(c)(3). The Supreme Court of the United States has ruled that 8 U.S.C. §1226(e), which precludes review of the "Attorney General's discretionary judgment" regarding "detention or release of any alien or the grant, revocation, or denial of bond or parole," does not deprive courts of jurisdiction to consider challenges to the mandatory detention statute. See Demore v. Kim, 538 U.S. 510, 517 (2003) (holding that a challenge to "the statutory framework that permits [petitioner's] detention without bail" is not the equivalent of "a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release.") (internal citations omitted). This Court therefore has subject matter jurisdiction over Mr. Burns' Petition.

    B.      Exhaustion of Remedies

Although neither party has addressed this issue, this Court notes nonetheless, "where Congress is silent on the issue of exhaustion, it is a matter of the Court's discretion whether a petitioner must exhaust his administrative remedies before applying for relief in federal court." Garcia v. Shanahan, 615 F.Supp. 2d 175, 179-80 (S.D.N.Y. 2009); Duy Tho Hy v. Gillen, 588

7

F.Supp.2d. 122, 125-26 (D.Mass. 2008) (holding that exhaustion of administrative remedies is not required "where the agency has predetermined the issue before it."); Pastor-Camarena v. Smith, 977 F.Supp. 1415, 1417 (W.D.Wash. 1997) ("Exhaustion is also not required if it would be futile.") (citing American-Arab Anti-Discrimination Committee v. Reno, 70 F.3d 1045, 1058 (9th Cir.1995)).

It would be futile for Mr. Burns to appeal the Immigration Judge's decision because the BIA has already decided that it will interpret 8 U.S.C. § 1226(c) to require Petitioner's mandatory detention in Matter of Saysana, 24 I & N. Dec. 602 (BIA 2008). Saysana is binding precedent on the BIA. See Matter of Facey, 2009 WL 638904 (BIA Feb. 23, 2009). Therefore, remedy exhaustion is not required in this case.

C.    Mandatory Detention without Bond

The central issue before this Court is whether Mr. Burns is subject to mandatory detention without bond pursuant to 8 U.S.C. §1226(c). To answer this question, this Court must determine whether the "when the alien is released" language refers to release from custody from *any* offense or only from a removable offense. The mandatory detention provisions did not take effect until 1998, eight years after Mr. Burns was released from prison in connection with his removable offense. As discussed *infra*, most courts confronting similar scenarios have held that the "when the alien is released" language refers only to release from the custody related to the removable offense. See e.g., Saysana v. Gillen, 590 F.3d 7 (1st Cir. 2009); Oscar v. Gillen, 595 F.Supp.2d 166 (D.Mass. 2009); Woo Park v. Hendricks, 2009 WL 3818084 (D.N.J. 2009). Under this interpretation, aliens such as Mr. Burns (who were released from custody related to their removable offense prior to the mandatory detention provisions's 1998 effective date) are not subject to mandatory detention.

Contending that this interpretation of the "when . . . released" language is not the only plausible one, the Government argues that the statute is ambiguous. Thus, the Government

continues, the Board of Immigration Appeals' decision in <u>Saysana</u> relied upon by the Immigration Judge here, is entitled to deference under <u>Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.</u>, 476 U.S. 837 (1984).  For clarity's sake, I provide the following background of the BIA's <u>Saysana</u> decision.

       1.       The BIA's Interpretation of §1226(c)

The IJ's interpretation of 8 U.S.C. §1226(c) was based primarily on the BIA's decision in <u>Saysana</u>.  <u>See</u> Immigr. Order at 2.  <u>Saysana</u> involved facts substantially like those in the case at hand.  Mr. Saysana was charged with removeability under 8 U.S.C. §1227(a)(2)(A)(iii), based on his November 15, 1990 conviction for indecent assault and battery.  <u>See Saysana</u>, 24 I & N. Dec. at 602.  He was subsequently arrested for failure to register as a sex offender on May 3, 2005.  <u>Id.</u>  The issue before the BIA was whether a "release" after the effective date of §1226(c) must be from custody that qualified the criminal alien for removability, or whether it could be a "release" from custody related to an offense that did not qualify the alien for removability.  <u>Id.</u> at 603-4.

In <u>Saysana</u>, the BIA noted that sections 1226(c)(1)(A) and (D) subject an alien to mandatory detention under circumstances where the alien has not even been convicted of an offense that requires the alien's removal.  <u>Id.</u> at 605, 605 n.3.  Section 1226(c)(1)(A), for example, incorporates crimes listed in 8 U.S.C. § 1182(a)(2) as the basis for mandatory detention.  That statute, § 1182(a)(2), deems inadmissible aliens who admit having committed acts "which constitute the essential elements of . . . crime[s] involving moral turpitude," drug-related conspiracies, prostitution, *inter alia*, even if never charged with or convicted of such crimes.  <u>See</u> 8 U.S.C. § 1182(a)(2)(A)(i); 8 U.S.C. § 1182(a)(2)(D).  Another provision deems inadmissible aliens whom "the Attorney General *knows or has reason to believe* is or has been an illicit trafficker in any controlled substance ...."  8 U.S.C. § 1182(a)(2)(C) (emphasis added).  Because it is impossible for an alien to

be "released" in connection with actions for which he was never charged or convicted, the BIA interpreted the "when released" phrase to refer to release from custody relating to any offense committed after the 1998 effective date.[4]  Id. at 605-6.

The BIA went on to review the pertinent legislative history and concluded that the history supported its interpretation.  Id. at 606 ("Congress has consistently demonstrated a desire that criminal and terrorist aliens be detained during the pendency of their proceedings.").  Mr. Saysana had been released from some form of custody after the § 1226(c)'s effective date in 1998.  Therefore, the BIA concluded that Mr. Saysana was subject to mandatory detention.  Id. at 608.

      2.     Saysana's Reception in the Courts

Two months after the Saysana decision, the court in Thomas v. Hogan, 2008 WL 4793739, (M.D. Pa. 2008) reached a contrary conclusion in a case involving similar facts.  Thomas held that §1226(c)'s mandatory detention provision did not apply to the petitioner.  The court reasoned that because the petitioner had been released from criminal custody for his removable offense before the statute's effective date, the statute did not apply.  Id.  at *4-5.[5]

Shortly after the Thomas decision, Saysana's reasoning was rejected by the District Court for the District of Massachusetts in Saysana v. Gillen, 2008 WL 5484553 (D. Mass. 2008), a habeas proceeding brought by Mr. Saysana following the BIA's adverse decision.  In ruling in the detainee-petitioner's favor, the district court adopted Thomas' reasoning.  The district court's ruling was

---

[4]     As discussed in more detail *infra,* the BIA's reasoning appears to be based on the maxim that courts may "look past the plain meaning [of statutory language where] it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it."  Lloyd v. HOVENSA, LLC., 369 F.3d 263, 270 (3d Cir. 2004) (quoting  Mitchell v. Horn, 318 F.3d 523, 535 (3d Cir. 2003)) (internal quotation marks omitted).

[5]     The Thomas Court further noted that it was "undisputed that the [post-1998] convictions . . . have absolutely no bearing on the removal proceedings."  Id.  at *5.

recently affirmed by the Court of Appeals for the First Circuit.  See Saysana v. Gillen, 590 F.3d at 10.[6]

The Thomas and District of Massachusettes' decisions were the first rumbles in what has become an avalanche of district court rulings that have rejected the BIA's reasoning in Saysana, and refused to accord the BIA's decision Chevron deference.  Each of these cases, along with the First Circuit's recent opinion, has held that the "when the alien is released" language of section 1226(c) refers to release from custody from incarceration resulting from a removable offense after section 1226(c)'s effective date.  See, e.g., Garcia, supra; Duy Tho Hy v. Gillen, supra; Ortiz v. Napolitano, 2009 WL 3353029 (D.Ariz. 2009); Mitchell v. Orsino, 2009 WL 2474709 (S.D.N.Y. 2009); Woo Park v. Hendricks, 2009 WL 3818084 (D.N.J. 2009); Burns v. Weber, 2010 WL 276229 (D. N.J. January 19, 2010).  Garcia is currently on appeal before the Court of Appeals for the Second Circuit.

3.      Analysis

Nevertheless, Respondent argues that this Court should grant Chevron deference to the BIA's decision in Saysana.  Respondent argues that section 1226(c)(1) is "inherently ambiguous with regard to whether 'when released' only means release from criminal incarceration for the offense giving rise to removability, or whether it includes release of a criminal alien from other non-DHS custody." Br. for Resp. at 17.  Therefore, the Respondent argues, the BIA's interpretation in Saysana, should be given deference.    See id. at 17 ("[T]he BIA is entitled to deference in interpreting ambiguous provisions of the INA.") (citing Negusie v. Holder, 129 S. Ct. 1159, 1163-64

--------------------------------------------------

[6]      That the First Circuit rejected the BIA's reasoning does not wholly undermine the authority of the BIA's decision.  Because Saysana v.  Gillen was presented to the First Circuit on habeas review, as opposed to direct appeal from the BIA's Saysana ruling, the First Circuit's opinion did not overrule the BIA's decision.  Furthermore, "[the BIA] is not required to accept an adverse determination by one circuit court of appeals as binding throughout the United States." State v.  Ga.  Dept.  of Med.  Assistance v.  Bowen, 846 F.2d 708 (11th Cir.  1988) cited in Zamora-Mallari v.  Mukasey, 514 F.3d 679, 685 (7th Cir.  2008).

(2009)).

I agree with the plethora of decisions that have found § 1226(c)'s language unambiguous. Congress clearly intended to limit the "when released" language to those offenses and grounds for inadmissibility set forth in section 1226(a)(1)(C). Congress begins in § 1226(a) by stating that "[e]xcept as provided in subsection (c) . . ., the Attorney General may release [detainees] on bond ..." In subsection (c), Congress goes on to specify the aliens not permitted to be released on bond, *i.e.*, those detained or imprisoned under the circumstances detailed in subsections (c)(1)(A) through (c)(1)(D). The statute then states that, for those aliens who fall within (c)(1)(A)-(D)'s proscription, they must be held without bond "when . . . released." The "when released" phrase clearly refers back to the detention or imprisonment set forth in (c)(1)(A)-(D). Accord Oscar v. Gillen, 595 F.Supp.2d at 170.

Hence, the statute's unambiguous language makes clear that those aliens who are detained or imprisoned *in connection with (c)(1)(A)-(D) convictions or actions* must be subject to mandatory detention. It follows from this that an alien must have been deemed deportable or inadmissible after the 1998 effective date of the statute. Because Mr. Burns was released prior to the 1998 effective date, I conclude that he is not subject to mandatory detention.

> a.      The "Offense" Anomaly

Courts may "disregard an unambiguous directive of Congress where failing to do so produces a nonsensical result that could not have been intended." Lloyd, 369 F.3d at 269. The Government, as did the BIA in its Saysana decision, points out that section 1226(c) can be interpreted to require "the detention of aliens who may never be convicted or incarcerated for the offense giving rise to removability." Id. at 18-20; Saysana, 24 I & N Dec. at 605 n. 3. Because aliens who are inadmissible under these provisions "would not be necessarily subject to criminal or other

non-DHS custody," id. at 19, the Government argues that the "when released" language of section §1226(c) is ambiguous as to whether the release must be from custody resulting from a removable offense, or any offense after the effective date of the statute.  Id. at 18-20.  This anomaly,  so goes the argument, cannot be what Congress intended.

I reject this argument.  For one, as the Government necessarily concedes, the "when released" language does make sense, particularly when viewed in connection with other sections of the statute.  Many of the bases for removal are actually for prior criminal convictions, including the bases relied upon to seek removal of the petitioner here.[7]  See, e.g., 8 U.S.C. § 1182(a)(2)(A)(i)(I) and 8 U.S.C. § 1227(a)(2)(A)(i)(I) (crime involving moral turpitude); 8 U.S.C. § 1182(a)(2)(A)(i)(II) and 8 U.S.C. § 1227(a)(2)(A)(i)(II) (drug conspiracy); 8 U.S.C. § 1182(a)(2)(B) and 8 U.S.C. § 1227(a)(2)(A)(ii) (multiple criminal convictions).  As a result, the "when released" language could be read as generally limiting application of the mandatory detention provision to those removability provisions (such as 8 U.S.C. § 1182(a)(2)(A)(i)'s drug-related crime provision) based

---

[7]    I find the following reasoning of the Velazquez Court, rejecting the Government's purported anomaly in a similar context, equally appropriate here:

> This court recognizes the apparent inconsistency created by Congress in enacting a statute which includes aliens who would never technically be "released" in a provision which mandates taking them into custody when they are released. While respondents' assertion that the statute applies to aliens irrespective of when or how they came into INS custody receives some support from this inconsistency, it impermissibly ignores, and, indeed, flatly contradicts numerous other eminently more explicit sections of the IIRIRA. This court cannot simply ignore the plain language of the statute which provides that an alien is to be taken into custody "when the alien is released," 8 U.S.C. § 1226(c), especially when it is clearly consistent with other sections, such as the one under which petitioner falls.

37 F.Supp.2d at 672 (rejecting the Government's argument that § 1226 applies retroactively to encompass removable offenses or acts committed prior to 1998).

on actual convictions.

Subsections § 1226(c)(1)(A), (B), and (C) require this reading.  These subsections specifically limit themselves to criminal offenses:

> The Attorney General shall take into custody any alien who—
>
>> (A) is inadmissible by reason of having committed *any offense covered in* section 1182(a)(2) of this title,
>>
>> (B) is deportable by reason of having committed *any offense covered in* section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>>
>> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of *an offense for which the alien has been sentence* [sic] to a term of imprisonment of at least 1 year ....

8 U.S.C. § 1226(c)(1)(A)-(C).

Subsection (D), by contrast, does not limit its incorporation of removable actions to criminal offenses.  It provides that an alien who "is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title" may be mandatorily detained.  8 U.S.C. § 1226(c)(1)(D).  The incorporated bases for removal – §§ 1182(a)(3)(B) and 1227(a)(4)(B) – authorize the Government to remove suspected and proven terrorists.  Given the special treatment under U.S. law accorded terrorist activities, it is not surprising that Congress would authorize mandatory detention for such aliens whether or not they were ever charged or convicted.

So, by properly interpreting the plain language of subsections (A)-(C), the Government's purported anomaly is limited to subsection (D).  Congress' exclusion of the "offense" language from subsection (D) makes clear that it intended both terrorist acts and convictions to serve as a basis for mandatory detention. Such a distinction is consistent with the special treatment accorded terrorist behavior under U.S. law.  Thus, though an alien believed to be a terrorist may never be "released" from custody, that slight anomaly is explained on other grounds.

14

Indeed, it is a rare circumstance that a statute's plain text may be disregarded in the manner the BIA and the Government suggest.  See Lloyd, 369 F.3d at 270 (stating that courts "are free to disregard an unambiguous directive of Congress only [only] in the *rare instances* where failing to do so produces a nonsensical result that could not have been intended." ) (emphasis added).  As the Third Circuit has noted, "[w]e do not look past the plain meaning of statutory language unless it produces a result *demonstrably at odds* with the intentions of its drafters . . . or an outcome *so bizarre* that Congress could not have intended it." Id. (internal quotation marks omitted) (emphasis added).  That the terrorism-related acts incorporated into § 1226(c)(1)(D) do not comport with the "when released" language is not the sort of "bizarre" result that justifies departure from the plain text.

Furthermore, this purported anomaly is partially due to the BIA's own prior interpretation of "released," which interpretation departs from the text of the statute.  The BIA has previously read "release" to mean release from only non-Department of Homeland Security ("non-DHS") custody.  See Saysana, 24 I & N Dec. at 604 ("[W]e have interpreted this language to include a release from a non-DHS custodial setting ...."). Yet, the BIA has acknowledged that the statute does not compel such a conclusion.  See id. ("The 'released' language . . . is not expressly tied to any other language that would clarify whether it refers to release from criminal custody, DHS custody, or some other form of detention.").  "Released" could be interpreted, instead, to cover release from criminal custody, DHS custody, or some other form of detention.

For example, aliens arriving in the U.S. who are not clearly admissible are detained by DHS pending removal proceedings to determine their admissibility. See Clark v. Martinez, 543 U.S. 371, 373 (2004) (discussing 8 U.S.C. § 1225(a)(3) and 8 U.S.C. § 1225(b)(2)(A)).  They may be released pending their removal proceeding.  See id. (discussing 8 U.S.C. 1182(d)(5); 8 C.F.R. § 212.5 (2004)).

If, after release from DHS-custody, it became apparent that the alien was subject to removal, the alien could be detained without bond under § 1226(c).

Consider the following illustration. As noted *supra*, aliens who have engaged in terrorist activity are inadmissible under 8 U.S.C. § 1182(a)(3)(B). Upon arrival to the U.S., "[i]f an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible [on this basis], the officer or judge shall . . . not conduct any further inquiry or hearing until ordered by the Attorney General." 8 U.S.C. § 1225(c)(1)(C). The Attorney General must, then, review the immigration officer's (or IJ's) decision. 8 U.S.C. § 1225(c)(2)(A). "If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case." Id. at § 1225(c)(2)(C). The Attorney General would then be permitted to take the alien into mandatory detention "when released" from DHS custody in connection with his admission. In this way, the statute cannot be said to lead to a bizarre result.

As demonstrated by this illustration, my interpretation of the mandatory detention provision is buttressed by the structure of the statute and how it fits within the immigration law scheme. The Supreme Court has made clear that

> [s]tatutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme - because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

United Sav. Assoc. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) (internal citations omitted).

b.      "Offense"

The Government further argues that the term "offense," as it appears in the "when . . .

released" paragraph following the enumerated offenses, refers to any offense resulting in release

from non-DHS custody.  Respondent's interpretation would thus give one meaning to the term

"offense," as it appears in the enumerated subparagraphs (A) - (C) and a different meaning to the

term as it appears in the "when . . . released" paragraph.  If I were to accept this interpretation, I

would be giving multiple meanings to the same term within one paragraph of the statute. "A term

appearing in several places in a statutory text is generally read the same way each time it appears."

Ratzlaf v. United States, 510 U.S. 135, 143 (1994).  See also Gustafson v. Alloyd Co., 513 U.S. 561,

570 (1995).  The Government's interpretation flies in the face of this statutory maxim.

In a related argument, the Government takes issue with the reliance by some courts on the

"for the same offense" language in § 1226(c).  In Duy Tho Hy v. Gillen, the District of

Massachusetts reasoned that

> The "when released" language immediately follows the enumerated
> offenses, and the clause is further modified by language providing
> that detention is required whether or not the alien may, among other
> things, be arrested again "for the same offense." The reference to the
> "same offense" in the phrase modifying the "when released"
> language suggests that the whole clause applies to a release from
> custody for the offense rendering the alien removable.

Id. at 127.  The Government argues this reasoning is erroneous, "rais[ing] the question of how an

alien convicted of and incarcerated for a removable criminal offense could ever be 'arrested or

imprisoned again for the same offense,' given the legal concept of double jeopardy under the

Constitution."  Govt. Opp. at 21.

It is the Government's argument, however, that is misguided.  The statute provides that the

alien shall be taken into custody by the Attorney General "when . . . released . . . without regard

to whether the alien is released on *parole, supervised release, or probation*, and without regard to

whether the alien may be arrested or imprisoned again for the same offense."  8 U.S.C. § 1226(c)

(emphasis added).  Clearly, an individual may be "imprison[ed] again for the same offense" after violating probation, for example.  <u>See</u> Gerald D. Miller, 33A N.J. Prac., Criminal Law § 42.4 ("When the court revokes a suspension or probation, it may impose on the defendant any sentence that it might have imposed originally for the offense of which the defendant was convicted.") (quoting N.J.S.A. 2C:45–3(b)).  As such an instance would create no double jeopardy problem, the Government's argument is without merit.

c.      Legislative History

The Government adds that the legislative history of the IIRIRA further supports its argument that section 1226(c) is ambiguous.  However, "[t]he preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." <u>BedRoc Ltd., LLC v. U.S.</u>, 541 U.S. 176, 183 (2004) (internal citations and quotations omitted).  For this reason, "our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." <u>Id.</u>  Because the statute is unambiguous on its face, this Court declines to unnecessarily probe the statute's legislative history.

d.      <u>Chevron</u> Deference and Retroactivity

Even if I were to agree that section 1226(c) is ambiguous, the BIA would still not be entitled to deference as to its interpretation.  In <u>Chevron</u>, the Supreme Court held that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency charged with administering that statute." <u>Tineo v. Ashcroft</u>, 350 F.3d 382, 396 (3d Cir. 2003) (quoting <u>Chevron</u>, 467 U.S. at 843-44) (internal quotation marks omitted). Generally, "the BIA should be accorded *Chevron* deference for its interpretations of the immigration laws." <u>Id.</u> (emphasis in original).

Where, however, an agency's interpretation is unreasonable, a court is free to reject it.  <u>Id.</u>

18

Congress explicitly provided that the mandatory detention provision "shall apply to individuals released after [the transition rules period]."  See IIRIRA § 303(b)(2).  That period ended in 1998. Thus, Congress explicitly gave § 1226(c) only prospective effect, accord Velasquez, 37 F.Supp.2d at 670, which the BIA has acknowledged.  See In re Adeniji, 22 I & N Dec. 1102, 1104 (BIA 1999).

The BIA's decision in Saysana, however, effectively gives section 1226(c) retroactive effect. By interpreting the "when released" language as release from *any* custody after 1998, the BIA's interpretation "bootstraps" pre-1998 removable offenses.  In this way, the BIA's interpretation results in an "end run" around the effective date of the statute.  Because giving the mandatory detention provisions of §1226(c) retroactive effect goes against congressional intent, the BIA's ruling in Saysana is patently unreasonable.  Accord Ogunbeken v. Sabol, 2009 WL 3245828, *4 (M.D.Pa. 2009); Velazquez, 37 F.Supp.2d at 671 n.8 ("Applying [section 1226] retroactively to aliens regardless of when they were released would render the phrase 'when the alien is released' surplusage."); see generally Bowen v. Georgetown University Hospital, 488 U.S. 204, 208-9 (1988) (noting that administrative agencies are without power to interpret legislation as having retroactive effect "unless that power is conveyed by Congress in express terms.").  This Court is therefore free to disregard the BIA's interpretation, even if section §1226(c) were ambiguous as to the meaning of "when released."

Hence I agree with the concern expressed by the First Circuit in its decision rejecting Saysana:

> That an alien might have committed a listed offense but never come into any form of custody from which "release" triggers mandatory detention does not justify a reading that attaches the serious consequences of the statute to a subsequent, otherwise wholly inconsequential, incident of criminal custody.

Saysana v. Gillen, 590 F.3d at 14.  The reason why retroactive application of a statute must be

expressly called for by Congress is to ensure that a party's liability for past conduct is not increased without that party having notice of the new law.  See generally Landgraf v. USI Film Products, 511 U.S. 244, 265 n. 17-18 (1994); see also id. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.").  The Government's and BIA's interpretation of the statute would have that pernicious effect.

Lastly, the Government argues that the BIA's interpretation is consistent with the purpose of § 1226(c), which is "preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  Br. for Resp. at 26 (quoting Demore, 538 U.S. 528).  It is true that Congress generally had this purpose in mind when enacting the statute.  However, it is far from clear, as demonstrated *supra*, that Congress intended to impose mandatory detention on aliens who committed removable acts or crimes prior to 1998.  Without a clear statement from Congress that it intended to detain without bond such aliens, I decline to read into the statute such an imposition.

e.      Practical Implications

As the BIA ruled in Saysana, the Government contends that the interpretation of section 1226(c) adopted by this Court ignores the practical implications of such an interpretation.  In the Government's view, such an interpretation "creates a rule whereby DHS must issue a notice of detention while the alien is still in criminal incarceration, because after he is released, if there is an intervening arrest that results in non-DHS custody, DHS will not be able to mandatorily detain the alien."  Br. for Resp. at 29.  While the practical effect of an interpretation of ambiguous legislation

20

may be considered by courts[8], the Government's aforesaid argument is both factually erroneous and illogical.

For one, it does not necessarily follow from this Court's interpretation that DHS must issue a notice of detention while the alien is still in criminal incarceration.  While this Court is not called upon to rule on exactly when an alien must be detained, other courts have held that the alien need not be secured by DHS before leaving criminal custody.  See e.g., Quezada-Bucio v. Ridge, 317 F.Supp.2d 1221 (W.D.Wash. 2004) (holding that alien must be taken into custody within a few months of release from criminal custody); Okeke v. Pasquarell, 80 F.Supp.2d 635, 639 (W.D. Tex. 2000) ("when the alien is released' specifies time at which [the Attorney General's] duty arises, not time at which alien must be taken into custody") (quoting In re Garvin-Noble, 1997 WL 61453 (BIA 1997)).  But see Pastor-Camarena v. Smith, 977 F.Supp. 1415 (W.D.Wash. 1997).[9]

Second, the Government's suggestion that the intervening arrest somehow deprives it of the ability to mandatorily detain is incomprehensible.  It is not that Mr. Burns was released from custody related to an "intervening" nonremovable offense that makes him ineligible for mandatory detention.  What renders him ineligible is that the release related to his removable offense occurred prior to § 1226(c)'s effective date.  If he was released from custody related to a removable offense after 1998, and was taken into DHS custody several years later, the only question before the Court would be whether the delay was consistent with the statute.  Likewise, if he committed an "intervening" nonremovable offense, and was taken into DHS custody only after release from that

---

8       American Tobacco Co. v. Patterson, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.")

9       The court in Pastor-Camarena held that aliens must be taken into custody "immediately." Id. at 1418.  However, that case involved an alien who was taken into custody "many years" after he was released from custody related to his removable offense. Id. Its holding, therefore, should be limited to its facts.

offense, the court would be presented solely with this same question. The existence of the nonremovable offense would have no effect on the court's analysis.

Moreover, subsection (d) of section 1226 strongly suggests that Congress' preference is for the Government to obtain custody of aliens as quickly as possible following release from custody related to their removable offense. That subsection requires the Attorney General to design and implement a 24-hour computer-based system that makes available to federal, state, and local authorities, border patrol agents, and inspectors at points of entry, "the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens ...." 8 U.S.C. § 1226(d)(1)(A), (C). The Attorney General must also assign parties as liaisons with law enforcement personnel. See id. This Court, of course, need not rule on the legality of a delay in securing an alien released from custody related to a removable offense that occurred *after* 1998 as that is not presented by the facts here.

4.    Additional Claims

Mr. Burns has also raised claims related to Due Process. Because the mandatory detention provisions of §1226(c) are inapplicable to Mr. Burns, this Court need not reach his constitutional challenges. Petitioner has also asked for attorney's fees, without citation to authorities granting him such an entitlement. His request is denied. Since there is no binding authority in the Third Circuit interpreting § 1226(c)(1), Petitioner cannot argue that the BIA was unjustified in applying its interpretation of the mandatory detention statute to him.

Respondent's motion to dismiss John E. Thompson as a Respondent is granted, as is Mr. Burns' motion to replace another respondent, Edward Cicchi, the Warden of the Middlesex County Department of Adult Corrections, with Oscar Aviles, the Warden of the Hudson County Correctional Center. As the Government agrees, Oscar Aviles is the appropriate respondent

because he is warden of the facility where Mr. Burns is currently being held.  See Rumsfeld v. Padilla, 542 U.S. 426, 434-35 (2004) ("In habeas challenges to present physical confinement . . . the default rule is that the proper respondent is the warden of the facility where the prisoner is being held.").

III.    CONCLUSION

Based on the reasons set forth above, this Court hereby grants Mr. Burns' Petition for a Writ of Habeas Corpus and hereby remands the matter to an Immigration Judge for a decision not inconsistent with this order.  Such Immigration Judge shall provide Mr. Burns with an individualized bond hearing within ten (10) days from the date of entry of this Order. Respondents shall not transfer Mr. Burns from this Court's jurisdiction until his bond proceedings are resolved, including the hearing and any appeal taken therefrom.  An appropriate Order accompanies this Opinion.


DATED:  March 10, 2010


/s/ Freda Wolfson
United States District Judge